**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **WILLIAM A.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 18 C 2098** |
| **v.** ) | |
| ) | **Magistrate Judge Jeffrey Cummings** |
| **ANDREW SAUL,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION AND ORDER**

Claimant William A. ("Claimant")[1] brings a motion for summary judgment to reverse the

final decision of the Commissioner of Social Security ("Commissioner") that denied Claimant's

claim for a period of disability and Disability Insurance Benefits ("DIBs") under 42 U.S.C. §§

416(i) and 423(d) of the Social Security Act.  The Commissioner has brought a cross-motion for

summary judgment seeking to uphold the Social Security Agency's decision to deny benefits.

The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to

28 U.S.C. § 636(c).  This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§

405(g) and 138(c)(3).  For the reasons stated below, Claimant's motion for summary judgment

[22] is granted and the Commissioner's motion for summary judgment [26] is denied.

**I.  BACKGROUND**

    **A.      Procedural History**

On January 4, 2015, Claimant filed a Title II application alleging a disability onset date

of February 25, 2013.  (R. 131).  His claim was denied initially on July 17, 2015 and upon

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social
Security applicant in an opinion.  Therefore, only the claimant's first name shall be listed in the caption.
Thereafter, we shall refer to William A. as Claimant.

reconsideration on December 9, 2015. (R. 131). On December 16, 2016, an Administrative Law

Judge ("ALJ") issued a written decision denying benefits to Claimant. (R. 133-57). The

Appeals Council granted review on limited grounds and issued its own decision on February 12,

2018, making the Appeals Council's decision the Commissioner's final decision.[2] (Tr. 1-10).

Claimant subsequently filed this action in District Court.

### B.      Medical Evidence

#### 1.      Evidence from Claimant's Treatment History

Claimant was injured on February 25, 2013 after lifting a box at work that weighed 100

pounds. He started physical therapy in March 2013 and an April 11, 2013 MRI showed mild

disc desiccation at L3-L4 and L2-L3 with diffuse disc bulging. There was subtle bulging at L4-

L5 and a subtle annular tear at L5-S1. (R. 393). Claimant was discharged from physical therapy

on April 12, 2013, when he reported less pain and a 40 percent improvement in his condition.

(R. 435).

Because Claimant's injury was work-related, he was referred on April 26, 2013 for a

workers compensation evaluation by orthopedist Dr. Beth Froese. She diagnosed lumbar strain,

lumbar disc degeneration, and an annular tear at L5-S1. Dr. Froese prescribed the muscle

relaxant Skelaxin and returned Claimant to light duty work as of the date of the exam. (R. 440).

Dr. Froese continued the Skelaxin at the next exam on May 20, 2013 and recommended an

epidural injection if the pain continued. (R. 443). Dr. Froese noted on July 22, 2013 that

Claimant had refused to take the Skelaxin because he thought it might be addictive. He showed

full strength with negative straight leg raising though some limitation was noted in his hip

---

[2] The Appeals Council adopted all of the ALJ's findings and only rephrased the ALJ's original statement
that Claimant could perform "simple and detailed tasks" to read "simple, routine and repetitive tasks."
(R. 5-6). For the sake of clarity, the Court refers to the decision as the ALJ's decision instead, as the
Commissioner cites it, the "AC's decision."

rotation. Dr. Froese stated that Claimant could return to full-duty work based on his lumbar MRI imaging. (R. 449-50).

Claimant had already sought a consultation with orthopedist Dr. David Fardon on July 9, 2013. Claimant told Dr. Fardon that his condition had improved but he was not ready to return to heavy-duty work. Dr. Fardon noted mild tenderness in the spine with no palpable abnormality. A hip x-ray showed a mild femoral impingement on the left hip with some degenerative lumbar spine changes. Dr. Fardon concluded that Claimant needed the care of a hip specialist because his pain was stemming more from Claimant's hip than from his lumbar spine. (R. 689-90). On Dr. Fardon's recommendation, Claimant sought treatment on August 9, 2013 from hip specialist Dr. Charles Bush-Joseph. Dr. Bush-Joseph noted that Claimant's x-rays showed moderate to severe osteoarthritis in the hips with the right worse than the left and a long-standing impingent. He also diagnosed low back strain "with probable radicular pain." (R. 687). Contrary to Dr. Fardon, Dr. Bush-Joseph concluded that most of Claimant current pain resulted from the lumbar spine instead of the hips due to the radicular pain. He recommended an epidural injection. (R. 687).

On September 6, 2013, Claimant sought additional treatment from Dr. Burt Schell. Claimant described his pain as sharp and throbbing but did not show any radicular pain. Dr. Schell diagnosed lumbar strain with pre-existing degenerative hip arthritis. Like Dr Bush-Joseph, Dr. Schell did not believe that Claimant's pain stemmed from the hips but rather from his work-related lumbar strain. Dr. Schell stated that no injection would be helpful and released Claimant to his work because he had "reached maximum medical improvement." (R. 551-52). Claimant did not return to work, however, and on October 15, 2013 Dr. Fardon recommended that he begin a work conditioning program to help him do so. Claimant began the program but

quit after one week when his condition became worse.  He began the program again in January 2014 and was successfully discharged from it in April 2014. (R. 695-96).

After a period of non-treatment, Claimant initiated treatment with Dr. Facundo Dovale on May 28, 2015 complaining of severe hip pain that had increased since he last saw Dr. Bush-Joseph.  Claimant received a hip injection in June 2015 that relieved his pain for a week, after which it again returned. (R. 833).  Dr. Dovale stated he would refer Claimant for surgery but Claimant told him on July 16, 2015 that he had not been able to follow up with a hip surgeon because his workers compensation case was still open regarding his back pain instead of non-work related hip pain.  (R. 834).  Dr. Dovale then prescribed a cane on August 10, 2015.  (R. 980).

Although the record is unclear on the date, Claimant was subsequently recommended by Dr. Dovale for a total hip replacement.  He was also referred to psychologist Dr. Karla Ivankovich for a psychological evaluation due to anxiety about the procedure.  Dr. Ivankovich wrote Dr. Dovale on October 12, 2015, recommending that Claimant undergo psychotherapy and take anti-anxiety medication to make him a better candidate for surgery.  (R. 870).  The final entry in the record – a September 15, 2016 note from a Dr. Morgan – states that Claimant had been cleared for a total hip replacement.  (R. 982).

## 2.      Evidence from State-Agency Doctors

On June 16, 2015, Dr. Yacob Gawo issued an opinion for the Social Security Administration.  Dr. Gawo concluded that Claimant could frequently lift ten pounds and occasionally lift 20 pounds; could stand or walk for four hours during a normal workday; and could sit for six hours.  (R. 104).  Claimant could occasionally climb ramps and stairs, kneel, crouch, and crawl but he could never climb ladders, ropes, or scaffolds.  (R. 105).  Dr. Co Vuong

agreed with that assessment on reconsideration on November 10, 2015. (R. 117). Dr. David Biscardi issued a mental assessment of Claimant on October 6, 2015, concluding that Claimant's affective and anxiety disorder were not severe. (R. 119).

On May 1, 2015, Dr. Peter Biale conduced an internal medicine examination of Claimant. Dr. Biale noticed a full range of motion of Claimant's spine but with some limitation in the lumbosacral region. Claimant showed a positive straight leg raise at ten degrees.[3] Dr. Biale diagnosed Claimant with low back pain and a painful right hip. (R. 810-12).

Claimant was also examined by psychologist Dr. Mark Langgut on November 9, 2015. Claimant reported that he had been dealing with depression and anxiety his whole life but that his symptoms had increased since his 2015 injury. Dr. Langgut noted that Claimant was currently taking Cymbalta, Lorazepam, and Alprazolam for his mental distress as well as other medications for pain. He was able to remember six digits forward and three backward and demonstrated adequate short-term memory. Dr. Langgut determined that Claimant showed average thought coherence, speed, and suggestibility, and he diagnosed Claimant with mild to moderate depression and a generalized anxiety disorder. (R. 853-56).

## C. Evidence From Claimant's Testimony

Claimant appeared at an administrative hearing held on September 29, 2016. He told the ALJ that the pain in his lower back and hips only allowed him to sit for 30 minutes before he has to get up and move around for 15 minutes. (R. 48, 63). He needs to alternate sitting and standing throughout the day and also needs to lie down frequently. (R. 48-49). Claimant can only walk for 25 feet at a time and can stand for only 15 minutes. (R. 64). Getting in or out of a car or a bathtub necessitates that Claimant manually lift his leg. (R. 49, 60). Claimant's pain can

---

[3] A straight leg raise test is used to determine if a person's lower back pain is due to a lumbosacral nerve root irritation. https://www.ncbi.nlm.nih.gov/books/MBK539717 (last visited July 11, 2019).

require him to seek help from his wife to dress or put on shoes. (R. 59). He can only sleep between four and five hours a night due to pain and wakes up unrefreshed. (R. 60). Claimant further testified that his pain makes him feel isolated and depressed. (R. 61, "And it's just become just very, very depressing"). A normal day for Claimant includes sitting down for 15 to 20 minutes after he wakes up, eating breakfast, then needing to lie down again around noon. (R. 51). The pain medication that Claimant takes exacerbates his need to lie down and makes him "very unfocused." (R. 62).

### D.     The ALJ's Decision

On December 16, 2016 the ALJ issued a decision finding that Claimant was not disabled. Applying the five-step sequential analysis that governs disability decisions, the ALJ found at Step 1 that Claimant had not engaged in substantial gainful activity since his alleged onset date of February 25, 2013. Claimant's severe impairments at Step 2 were spine disorders, fracture of a lower limb, bilateral hip osteoarthritis, an affective disorder, and an anxiety disorder. (R. 133). None of these impairments met or medically equaled a listing at Step 3 either singly or in combination. The ALJ applied the "special technique" that was formerly set out in 20 C.F.R. § 404.1520a to evaluate the severity of a claimant's mental impairment.[4] He determined that Claimant had mild restrictions in his activities of daily living ("ADLs") and social functioning and a moderate limitation in concentration, pace, or persistence. Claimant had experienced no episodes of decompensation. (R. 134-35).

---

[4] Because the ALJ issued his decision in December 2016, he addressed the issues that governed the special technique analysis at that time – the "Paragraph B" factors under listing 12.00 that were used to assess the severity of a mental impairment. That included an assessment of the claimant's (1) activities of daily living, (2) social functioning, (3) ability to maintain concentration, persistence, or pace, and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3) (2015). The Paragraph B factors have subsequently been amended to include a claimant's capacity for (1) understanding, remembering, or applying information, (2) interacting with others, (3) concentrating, persisting, and maintaining pace, and (4) adapting and managing oneself. *See* 81 Fed.Reg. 66,138 (Sept. 26, 2016).

Before moving to Step 4, the ALJ evaluated Claimant's testimony about his symptoms, finding that it was not entirely consistent with the objective medical evidence and other evidence in the record. (R. 137). The ALJ also assigned weights to some of the reports issued by medical experts concerning Claimant's condition. He gave great weight to the findings issued by internal medicine expert Dr. Peter Biale. (R. 140-41). Great weight was also given to the psychological report of Dr. Langgut. (R. 145). By contrast, the ALJ assigned "some" weight to Dr. Ivankovich's psychological report. Great weight was given to the state-agency medical consultants who evaluated Claimant's physical condition. However, little weight was given to the state-agency psychological experts. (R. 146-47).

Based on these findings, the ALJ issued two separate residual functional capacity ("RFC") assessments concerning Claimant's ability to work. For the period of February 25, 2013 through August 9, 2015, the ALJ concluded that Claimant could carry out light work as that exertional capacity is defined under 20 C.F.R. § 404.1567(b). He could stand or walk for four hours in a normal workday but would need a sit/stand option that permitted him to sit or stand "at least one to two times per hour while remaining on task 90 percent of the day." (R. 136). In addition to various other limitations, Claimant would also be restricted to "simple, routine, and repetitive tasks." (R. 136).

For the period after August 10, 2015 – when a cane was prescribed for Claimant – the ALJ found that he could only perform sedentary work as defined under 20 C.F.R. § 404.1567(a). Claimant would need the same sit/stand option that was included in the first RFC and would again be required to be on task 90 percent of the day. However, Claimant would also be allowed to stand and stretch two times each hour "for a brief period." The ALJ self-contradictorily stated

that Claimant would be restricted to "simple *and* detailed tasks" but the Appeals Council later revised that to read "simple, routine and repetitive tasks."  (R. 8, 144) (emphasis added).

Based on the testimony of a vocational expert ("VE"), the ALJ found at Step 4 that neither of these RFC assessments would permit Claimant to perform his past relevant work as a route driver, janitor, can sorter, or warehouse worker.  The VE testified that jobs existed in the national economy that a person with either of Claimant's RFC assessments could perform. Accordingly, the ALJ determined at Step 5 that Claimant was not disabled either from February 25, 2013 through August 9, 2015 or from August 10, 2015 through the date of the decision on December 16, 2016.  (R. 144, 148).

## II.  LEGAL ANALYSIS

### A.  The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 4243(d)(1)(A).  Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized."  20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims.  20 C.F.R. § 404.1520.  The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability.  20 C.F.R. § 404.1520(a)(4)(i).  It then determines at step two whether the claimant's physical or mental impairment is severe and meets the twelve-month duration requirement noted above.  20 C.F.R. § 404.1520(a)(4)(ii).  At step three, the SSA compares the impairment or combination of

impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, the individual is considered to be disabled, and the analysis concludes. If the listing is not met, the analysis proceeds to step four. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his or her exertional and non-exertional capacity to work. The SSA then determines at step four whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id*. If the claimant cannot undertake her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform in light of her RFC, age, education, and work experience. An individual is not disabled if he or she can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

## B. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1983). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent

symptom evaluations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## III. DISCUSSION

Claimant argues that the Commissioner's decision requires remand because the ALJ failed to (1) properly assess Claimant's testimony concerning the severity and frequency of his symptoms and (2) correctly explain the reasons that support either of the RFC assessments that the ALJ formulated for Claimant. Claimant also contends that the Appeals Council failed to consider a statement that Claimant submitted to the Council on December 4, 2017.[5] Because the Court agrees with Claimant's first two claims, it does not address his argument concerning the Appeals Council.

### A. The ALJ Improperly Evaluated Claimant's Symptom Testimony

Once an ALJ determines that a claimant has a medically determinable impairment, the ALJ must evaluate the intensity and persistence of the symptoms that can reasonably be expected to stem from it. A court may overturn a symptom evaluation if the ALJ fails to justify his or her conclusions with specific reasons that are supported by the record. *Cullinan v. Berryhill*, 878

---

[5] The Appeals Council's February 2018 order stated that the Council "received no statement or additional evidence" from Claimant. (R. 4). Claimant points out that on December 4, 2017 his counsel sent a letter to the Appeals Council complaining that the ALJ had not called a medical expert to testify at the hearing and that Claimant should be found to be disabled because on December 2, 2017 he became "an individual closely approaching advanced age" – 50 years old – as that term is construed by the SSA. (R. 11).

F.3d 598, 603 (7th Cir. 2017). An ALJ's analysis should consider the claimant's daily activities; the frequency and intensity of his symptoms; the dosage and side effects of medications; non-medication treatment; factors that aggravate the condition; and functional restrictions that result from or are used to treat the claimant's symptoms. 20 C.F.R. § 404.1529(c); SSR 16-3p. When considering a claimant's symptoms, the ALJ must build a logical bridge between the symptom evaluation and the record. *See Cullinan*, 878 F.3d at 603; *Villano v. Astrue*, 556 F.3d 558, 562-63 (7th Cir. 2009) (requiring an analysis of the SSR 16-3p factors as part of a logical bridge for the symptom evaluation).

The Court begins with two broad objections to Claimant's testimony that the ALJ raised but did not explain in a manner that permits the Court to adequately follow the basis of his reasoning. The ALJ stated that Claimant's subjective statements "cannot substitute for the objective medical evidence in the record" and discounted his testimony because the medical evidence "does not fully support the claimant's allegations regarding the extent of his mental and physical impairments." (R. 147). The Court agrees that a claimant's symptoms – which SSR 16-3p defines as "an individual's statements" – are never sufficient, at least without some supporting evidence, to determine whether a claimant is disabled or if an impairment exists. *See* SSR 16-3p, 2017 WL 5180304, at *2 ("[S]ymptoms are not enough to establish the existence of a physical or mental impairment or disability.").[6]

The ALJ, however, appears to have meant more than this well-established point. By including these observations in the symptom analysis, the ALJ suggested that objective tests must also confirm everything that a claimant states and that his or her testimony must be rejected when such medical evidence is absent. To the contrary, SSR 16-3p advises ALJs that

---

[6] Social Security Rulings "are interpretive rules intended to offer guidance to agency adjudicators." *Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999). They do not have the force of law or a regulation, though they are binding on the SSA. *Id*.

"[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." *Id*. at 5. Therefore,

> we will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual. A report of minimal or negative findings or inconsistences in the objective medical evidence is one of the many factors we must consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms.

*Id*. When a disability decision cannot be made solely on the basis of the objective record, an ALJ must continue the symptom evaluation and "carefully consider other evidence in the record," including "statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms[.]" *Id*. at *6.

The fact that the medical record does not confirm every symptom that a claimant describes, therefore, is not a legitimate ground for discounting his testimony. Indeed, adjudicators are only required to evaluate a claimant's testimony when the record does *not* fully support what the claimant alleges. *Richardson v. Astrue*, No. 10 C 465, 2011 WL 2262927, at *6 (N.D.Ill. June 9, 2011) ("If the medical record fully supports the claimant's testimony, no [symptom] determination is required. If the record does not substantiate the claimed limitations, an ALJ then considers . . . the intensity and persistence of a claimant's symptoms."). Thus, the fact that the ALJ in this case evaluated Claimant's symptoms already assumes that the record did not confirm all of his testimony. While medical tests are a "useful indicator" that ALJs can rely on to evaluate testimony, SSR 16-3p, 2017 WL 5180304, at *5, "an ALJ may not ignore a claimant's subjective reports of pain simply because they are not fully supported by objective medical evidence[.]" *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008); *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005) ("It is well-settled that an ALJ may not discount a claimant's

allegations of disabling pain solely because the objective medical evidence does not fully support them.") (internal quotes and citation omitted).

To his credit, the ALJ moved beyond these generalized statements and considered a range of Claimant's medical tests by dividing his decision into two parts. The first addressed the period of February 25, 2013 through August 9, 2015. The second discussed the period starting on August 10, 2015, when the ALJ reduced Claimant's RFC from light to sedentary work after Dr. Dovale prescribed a cane for his hip arthritis on that date. (R. 980, "D(x) OA Hips"). The ALJ discounted Claimant's testimony for the first RFC period on the ground that that imaging reports showed only "relatively mild findings of degenerative processes" in Claimant's spine and hips. (R. 142).

The ALJ's reasoning fails to support the symptom analysis during the first RFC period on two grounds. First, even if Claimant's spine images revealed only mild degenerative changes Claimant's doctors did not agree that the lumbar spine was the true source of his most serious pain. Dr. Fardon stated that it stemmed from the right hip. (R. 689-90). Second, the ALJ did not account for all the relevant medical evidence for the first RFC period. Hip specialist Dr. Bush-Joseph stated on August 9, 2013 that Claimant had "moderate to severe osteoarthritis" in the right hip along with a "long-standing chronic Cam impingement," thereby contradicting the ALJ's conclusion that only mild degenerative processes were present. (R. 686). On May 15, 2015, Dr. Biale noted that Claimant's right hip pain caused him to walk with a limp and made it problematic for him to get on or off the exam table. (R. 811). The ALJ gave great weight to Dr. Biale's report and noted that the physician cited "moderate osteoarthritis" in the right hip. (R. 140). Like Dr. Bush-Joseph's findings, Dr. Biale's conclusions suggest that Claimant suffered

from greater restrictions than the ALJ was willing to accept based on his conclusion that Claimant only had "mild" arthritic degeneration.

The problem with the ALJ's reasoning is not that he overlooked most of these and other relevant records as part of his evidentiary review, including x-rays that showed a "very mild degenerative change of both hips." (R. 845). Rather, throughout his decision the ALJ (1) never moved beyond a mere review of the evidence to explain how he reached the symptom analysis and (2) did not reconcile records that supported his view with those that did not. An evidentiary summary is not sufficient when, as here, it leaves a court wondering how the ALJ derived his conclusions from data like x-rays and reports. *See Elmalech v. Berryhill*, No. 17 C 8606, 2018 WL 4616289, at *10 (N.D.Ill. Sept. 26, 2018) ("Merely summarizing the record, however, is not in itself a substitute for an ALJ's duty to explain the basis of [his findings]."); *Alevras v. Colvin*, No. 13 C 8409, 2015 WL 2149480, at *4 (N.D.Ill. May 6, 2015); *Chuk v. Colvin*, No. 13 C 8409, 2015 WL 6687557, at *8 (N.D.Ill. Oct. 30, 2015). Moreover, the ALJ had a responsibility to reconcile the conflicting accounts of Claimant's arthritis. "An ALJ . . . is not only allowed to, he must, weigh the evidence, draw appropriate inference from the evidence, and, where necessary, resolve conflicting medical evidence." *Thorps v. Astrue*, 873 F.Supp.2d 995, 1003 (N.D.Ill. 2012).

The ALJ's account for the second RFC period that began on August 10, 2015 presents even greater problems. The ALJ included a separate symptom analysis for the second period that questioned Claimant's testimony because he allegedly showed increased functionality in his lumbar spine. (R. 147, "While the claimant has experienced exacerbations in symptomology related to his work-related lumbar strain, progress notes indicate . . . periods of stability with improved functionality"). The ALJ's second symptom analysis, however, made no reference to

Claimant's hip pain. The Court is unable to follow the ALJ's reasoning because, having reduced the RFC *because* of Claimant's hip arthritis, he clearly thought that hip pain was Claimant's most significant medical challenge. The ALJ could not provide a meaningful analysis of Claimant's testimony about the period after August 10, 2015 by limiting his discussion to Claimant's lumbar spine.

The Court recognizes that "it is proper to read the ALJ's decision as a whole" instead of dividing it into carefully-separated parts. *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004). It may be that the ALJ intended to apply his earlier remark that Claimant's hip images only showed mild degenerative changes to the second RFC period as well. If so, the ALJ still failed to explain the basis of his reasoning concerning Claimant's hips. By October, 12, 2015, for example, Claimant was already a candidate for a total hip replacement. (R. 870). On July 1, 2016, Dr. Anna Morgan referred Claimant to an orthopedist due to "chronic r[ight] hip severe osteoarthritis," and Claimant was tentatively scheduled for hip replacement surgery by September 15, 2016. (R. 981-82). These facts strongly suggests that Claimant suffered serious hip pain regardless of whether x-rays revealed mild, moderate, or severe arthritic changes. *See* https://www.webmd.com/arthritis/hip-replacement-surgery#1 ("Hip replacement surgery is a procedure . . . done when all other treatment options have failed to provide adequate pain relief.") (last visited July 2, 2019). By limiting the analysis to the objective images of Claimant's hip, therefore, the ALJ failed to account for those parts of the record that show increased pain and the need for surgical intervention.

In addition to objective tests, SSR 16-3p also requires an ALJ to consider the type and dosage of medication that a claimant takes to treat his symptoms. SSR 16-3p, 2017 WL 5180304, at * 8; *see Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) ("[T]he ALJ must

consider the claimant's . . . medication[.]").  The fact that a claimant takes medications that effectively manage his condition can be a reason for finding that the claimant's symptoms are not as serious as he claims.  Claimant in this case took a wide variety of medications for pain, depression, and anxiety.  These included Alprazolam, Diclofenac, Duloxetine, Gabapentin, Lorazepam, Tramadol, Flexeril, Toradol, Nabumetone, Naprosyn, Soma, Prednisone, Tylenol with Codeine, Skelaxin, Norco, and Cyclobenzaprine.  (R. 308, 378, 379, 419, 425, 440, 809, 959).

The ALJ's only consideration of this issue was to (1) note that Dr. Ivankovich recommended (unspecified) anti-anxiety medication for Claimant after her October 2015 meeting with him and (2) state that "Dr. Alar" subsequently prescribed Cymbalta and Alprazolam to treat Claimant's symptoms.  (R. 145).  That fails to provide an accurate account of the evidence surrounding Claimant's medications.  The record does not contain any reference to a "Dr. Alar."  The Court is also unable to determine what the ALJ intended to reference to support his analysis.  The ALJ cited Ex. 18F/13 but that entry concerns an October 9, 2015 right hip injection given by Dr. Ivankovich's husband, Dr. Daniel Ivankovich.  (R. 883).  The note states that Claimant had already been prescribed Lorazepam (Ativan) and Tylenol with Codeine in August 2015 but makes no mention of Cymbalta or Alprazolam (Xanax) as the ALJ claimed. (R. 883).  In addition, other than briefly noting a prescription for Flexeril, (R. 137), the ALJ took no notice of the wide array of other medications that Claimant was prescribed during the three and one-half year period between his alleged onset date and the ALJ's decision, leaving almost his entire range of prescription medications unaddressed.

The ALJ further discounted Claimant's symptom testimony by determining that he only had a mild restriction in his ADLs.  The ALJ stated in broad terms that Clamant could drive a

16

car, cook, shop, and perform light stretching to relieve his back pain.  (R. 134).  It is true that

Claimant indicated that he was able to do certain aspects of the things that the ALJ identified.

The ALJ erred, however, by ignoring Claimant's "qualifications as to *how* he carried out those

activities."  *Craft*, 539 F.3d at 680.  Claimant stated, for instance, that:

> On a daily basis, I would, on an average day, I would wake up.  I would sit down
> for 15, 20 minutes, check my e-mail.  After that, go eat breakfast, return to the
> living room, sit for a while.  Usually by around noon, I would have to lay down.  I
> don't sleep that much at night.  I've been averaging about four to five hours, so I
> usually try to get some rest during the day, if at all possible.

(R. 51).  In addition, Claimant testified that he went grocery shopping "very seldom" and "really

don't [leave] the house at all" except to attend doctor's appointments.  (R. 55).  Claimant also

stated that he cooked but only by making sandwiches and meals that take ten minutes to prepare.

(R. 267).

Claimant's qualifications about his ability to carry out daily activities (which the ALJ

overlooked) suggest that he had more than the mild restrictions that the ALJ assessed.  In fact,

the ALJ himself noted that Claimant "indicated that he engaged in no . . . regular daily activities

due to chronic pain" but concluded nonetheless that Claimant was "able to engage in [ADLs] in

an appropriate and effective manner[.]"  (R. 134-35).  Nothing connects these two observations.

The ALJ was not required to accept everything that Claimant alleged, *Dampeer v. Astrue*, 826

F.Supp.2d 1073,1084 (N.D.Ill. 2011), but he had no basis for rejecting what Claimant stated

without first noting all of his testimony and providing some explanatory bridge between those

claims and the ALJ's own conclusion.  The Seventh Circuit has repeatedly instructed ALJs that a

claimant's simple household activities – which are often undertaken without supervision or any

time constraints – cannot be interpreted in the offhand manner that the ALJ employed in this

case.  *See*, *e.g.*, *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences

between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as [he] would be by an employer.") (citing cases); *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) ("The administrative law judge's casual equating of household work to work in the labor market cannot stand.") (citing cases).[7]

The ALJ also considered Claimant's treatment history and found that Claimant did not seek medical help for his pain between February 2014 and May 2015 – a gap which the ALJ interpreted to mean that Claimant's pain was less severe than he alleged.[8] *See Newell v. Astrue*, 869 F.Supp.2d 875, 889 (N.D.Ill. 2012) (noting that the failure to seek consistent treatment may support an adverse symptom analysis). Before an ALJ construes non-treatment against a claimant, however, he must ask the claimant "why he or she has not complied with or sought treatment in a manner consistent with his or her complaints." SSR 16-3p, 2017 WL 5180304, at *9; *see Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference.") (citing cases). Contrary to this directive, the ALJ did not ask Claimant anything at the administrative hearing about why he did not seek treatment between February 2014 and May 2015.

The mere absence of such questioning is not automatically erroneous because an ALJ can also reasonably rely on other parts of a claimant's record such as the ability to engage in ADLs

---

[7] *Bjornson* is especially critical of the failure to distinguish between a claimant's household activities and his or her ability to perform similar or more strenuous activities in a workplace. *See Bjornson*, 671 F.3d at 647 ("The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.").

[8] The ALJ's reference to February 2014 as the start of a non-treatment period is not entirely accurate. As the ALJ himself noted, Claimant was in physical therapy through April 2014. (R. 140).

or other activities that suggest that his or her impairments are not disabling. *See Lott v. Colvin*, 541 Fed.Appx. 702, 706 (7th Cir. 2013). Citing *Davis v. Berryhill*, 723 Fed.Appx. 351 (7th Cir. 2018), the Commissioner argues that the ALJ's failure to ask about Claimant's non-treatment does not require remand under the facts of this case. In *Davis*, an ALJ never asked the claimant why she did not take a breath test for her severe impairments of sleep apnea and asthma. Noting that an ALJ should ordinarily inquire about such issues, the Seventh Circuit found that the ALJ's failure to do so in *Davis* was not erroneous because the ALJ also based his symptom analysis on "many inconsistencies" that the claimant did not challenge on appeal. *Id*. at 357.

As the previous discussion shows, however, that reasoning does not apply here. The ALJ failed to explain why Claimant only had mild degenerative changes and failed even to note the ADL limitations that Claimant testified to. Moreover, it was crucial for the ALJ to ask Claimant about his non-treatment because Claimant had been diagnosed with the degenerative joint disease osteoarthritis. *See* https://www.arthritis.org./about-arthritis/types/osteoarthritis/what-is-osteoarthritis.php (last visited July 10, 2019). The Seventh Circuit has stressed the importance of accounting for degenerative conditions because "[t]he term 'degenerative' implies that [claimant] suffers from a condition that will get worse over time[.]" *Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013). Accordingly, an ALJ must keep the progressive nature of an impairment like arthritis in mind because it "often grows more severe with the passage of time." *Hill v. Colvin*, 807 F.3d 862, 869 (7th Cir. 2015).

The ALJ should have recognized that the record strongly suggests that some form of deterioration took place during the time that Claimant was not treated. The last glimpse of Claimant's condition that the ALJ gave at the start of the non-treatment period was an April 27, 2014 physical therapy note stating that his prognosis was "excellent," that he could occasionally

lift up to 75 pounds, and that he could return to work "without restrictions." (R. 140, 613). The next record entry – Dr. Biale's May 1, 2015 report – indicates a markedly different condition. Dr. Biale noted that Claimant limped when he tried to walk, had difficulty getting on and off the exam table, could not squat properly, and had a positive straight leg raise test at 10 degrees. A person with a positive straight leg test who has difficulty with the minimal effort required to get on and off an exam table has almost certainly experienced some form of deterioration after previously being assessed as able to lift 75 pounds and capable of returning to work without restrictions.

Importantly, the record in this case supports such an inference. Claimant told Dr. Dovale on May 28, 2015 that he was experiencing "severe" pain that had become "*progressively* worse" after his prior diagnosis of hip arthritis in 2013. (R. 958) (emphasis added). The subsequent evidence also indicates that Claimant's deterioration continued after treatment resumed in May 2015. He was a candidate for a total hip replacement by October 2015; had "severe osteoarthritis" by July 2016; and was scheduled for hip replacement surgery by September 2016. (R. 870-72). Although the ALJ noted some of these entries, he failed to link them in any way to Claimant's pain allegations. Without asking Claimant why he did not seek treatment between February 2014 and May 2015, therefore, the ALJ had no information about what Claimant's condition was like during this period or how quickly it changed. Thus, remand is necessary so that the ALJ can explain the basis of his reasoning more accurately and build a bridge between the record and Claimant's symptom allegations.

**B.      Substantial Evidence Does Not Support the ALJ's RFC Assessment**

Claimant argues that the ALJ failed to properly account for either his physical or mental RFC assessments.  The Court agrees that remand is also necessary on these grounds.

**1.      Claimant's Physical RFC**

The ALJ found that Claimant could perform a range of light work from February 25, 2013 through August 9, 2015, meaning that Claimant could only lift up to 20 pounds occasionally and ten pounds frequently during that period.  20 C.F.R. § 404.1567(b).  The ALJ's reasons for reaching that decision are not entirely clear but they appear to be based on weights that he assigned to several expert reports issued during the first RFC period.  Most importantly, the ALJ gave great weight to the opinions of the state-agency physicians that Claimant could perform light work.  The ALJ justified that conclusion by claiming that it was consistent with Claimant's "very mild osteoarthritis of the bilateral hips." (R. 146).  As noted above, however, *supra* at p. 13, Dr. Bush-Joseph found in August 2013 that Claimant had "moderate to severe" hip arthritis. (R. 686).  The ALJ never explained how Dr. Bush-Joseph's findings could be reconciled with the "very mild" findings that the ALJ cited to support the weight given to the state-agency experts.

The ALJ also failed to adequately explain why he reduced Claimant's RFC to sedentary work throughout the RFC period that began on August 10, 2015.  The only event that took place on that day was Dr. Dovale's prescription of a cane for Claimant. (R. 145).  If Claimant's RFC could be reduced based on that fact alone, it is difficult to understand why the need for increased medical intervention did not require additional accommodations for later parts of the RFC period.  The ALJ approached the issue to some degree by including a "stand and stretch" period in the second RFC to accommodate an October 2015 hip injection. (R. 145).  By doing so,

however, the ALJ highlighted the issue at hand without addressing it directly: if Claimant required an additional restriction because he needed an injection, then he presumably also required other accommodations after his condition reached the point where he needed the more invasive procedure of hip replacement surgery. Although the ALJ addressed some of the evidence that was relevant to the second RFC period, merely summarizing the record is not a substitute for explaining the basis for the RFC assessment. *Elmalech*, 2018 WL 4616289, at *10. Remand is therefore necessary so that the ALJ can explain how the second RFC accommodates all of the evidence relevant to the second RFC period.

### 2. Claimant's Mental RFC

The ALJ found that Claimant would be able to be on task at work for 90 percent of the time and was limited to simple, routine, and repetitive tasks. The Court agrees with Claimant that the ALJ failed to adequately explain how he reached those findings. The ALJ supported the mental RFC by citing a written statement from Claimant that he could finish what he started, follow instructions, and handle stress well. (R. 135, 270). However, Claimant also testified that pain medication changed his ability to function. (R. 61, "it makes it – just concentrating, just reading . . . then I'm so wiped out, as far as mentally, from the medication, that it's very hard to concentrate"). The ALJ did not consider Claimant's testimony on this issue or take note of the pain medication that he took. Without doing so, the ALJ did not account for all of the evidence that was relevant to determining the degree to which Claimant could be on task at work. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").

The Commissioner argues that the ALJ's mental RFC was also supported by the weights that he gave to the expert reports of psychologists Dr. Karla Ivankovich and Dr. Mark Langgut.[9] The Court disagrees on both points. Dr. Ivankovich issued a report on October 12, 2015 stating that Claimant suffered from "symptoms of anxiety, agitation, and cognitive distress" and was increasingly irritated by things that formerly caused him no distress. (R. 870). Dr. Ivankovich recommended that Claimant be given anti-anxiety medication and that he enter psychotherapy. (R. 870). The ALJ assigned only "some" weight to Dr. Ivankovich's report because (1) she only met with Claimant on one occasion and (2) Claimant did not follow through with Dr. Ivankovich's recommendation that he enter psychotherapy. (R. 146).

Neither of these reasons supports the ALJ's conclusion. It is true that greater weight is ordinarily given to the opinions of experts who have treated a claimant over a period of time than to those who are less familiar with his condition. *See* 20 C.F.R. §404.1527(c)(2)(ii). In this case, however, the ALJ employed self-contradictory reasoning by assigning "great" weight to the report of Dr. Biale – who, like Ivankovich, also examined Claimant only once – and to the reports of the state-agency medical experts who *never* examined him. (R. 140, 146). The ALJ provided no explanation of why Dr. Ivankovich's report was discounted because she examined Claimant once while the same standard did not weigh against other expert reports.

Further, the ALJ did not address why Dr. Ivankovich's report deserved less weight because Claimant did not comply with her recommendation to enter therapy. Claimant told the ALJ that he met with a social worker for treatment based on Dr. Ivankovich's advice but his insurance would only pay for one session. (R. 50). Claimant also sought therapy from Dr.

---

[9] At the time of the ALJ's decision, the evaluation of a treating source opinion was governed by SSR 96-2p. That SSR has since been rescinded but only for claims filed as of March 17, 2017. *See Edward H. v. Berryhill*, No. 18 C 3637, 2019 WL 1454511, at *2 n.4 (N.D.Ill. April 2, 2019). Claimant's application was filed on January 4, 2015.

Ivankovich herself. She declined to treat him, however, because her husband was the surgeon scheduled to perform Claimant's hip replacement. (R. 50). When Claimant admitted that he did not consult any other psychologist, the ALJ failed to ask him to explain his reasons for not doing so. The ALJ was not entitled to construe the lack of treatment against Claimant without first inquiring into his reasons for not doing so. *Shauger*, 675 F.3d at 696.

In contrast to Dr. Ivankovich's reports, the ALJ gave great weight to the November 9, 2015 report of Dr. Langgut, who concluded that Claimant had mild to moderate depression and a generalized anxiety disorder. (R. 856). The ALJ gave three reasons for his finding. First, he stated that Dr. Langgut's more moderate assessment of Claimant's condition was consistent with Claimant's "unremarkable activities of daily living." (R. 145). As discussed above, however *supra* at pp. 17-18, the ALJ mischaracterized Claimant's ADLs by understating the severity of his limitations.

Second, the ALJ said that Dr. Langgut's account was consistent with the fact that Claimant did not seek out mental health treatment. The ALJ should have been aware, however, that "[f]or some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009). Courts in this Circuit have advised ALJs on many occasions that they must consider the role that mental illness plays in the failure to follow treatment recommendations. *See*, *e.g.*, *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006) (stating that mental illness "may prevent the sufferer from taking her medicines or otherwise submitting to treatment"); *Pulley v. Berryhill*, 295 F.Supp.3d 899, 901 (N.D.Ill. 2018). Instead of following this well-established directive, the ALJ never asked Claimant to explain why he did not pursue psychotherapy. (R. 51).

Third, the ALJ credited Dr. Langgut's report because Claimant appeared to be cooperative, congenial, and showed "normal thought processes." (R. 145). However, a person does not have to be openly deranged or belligerent in order to suffer from a serious mental illness. As many courts have noted, the fact that a claimant is friendly and alert during a mental status exam is not a basis – at least without more discussion by the ALJ – for finding that he or she is less limited than the claimant alleges. *See*, *e.g.*, *Kangail*, 454 F.3d at 629 (rejecting an ALJ's finding that a claimant's allegation of mental illness was contradicted by "behaving pretty normally during her office visits"); *Voorhees v. Colvin*, 215 F.Supp.3d 358, 385 (M.D.Pa. 2015) (criticizing an ALJ's rejection of mental illness claims because the claimant "was noted to appear cooperative, friendly, and making good eye-contact").

Even if the ALJ was correct in giving great weight to Dr. Langgut's report, moreover, he drew no link between it – or any other part of the record – and the finding that Claimant could be on task 90 percent of the time during a normal workday. Dr. Langgut expressed no opinion on the appropriate percentage figure for Claimant and the ALJ never addressed the issue other than to announce it in the mental RFC. The 90 percent finding was important because the VE testified that an employer would ordinarily require an employee to be on task between 85 and 90 percent of the time. (R. 75). Given that the ALJ failed to notice Claimant's testimony that he could not focus when he was taking pain medication, the Court is unable to determine what persuaded the ALJ that Claimant could be on task 90 percent of the time instead of, say, 80 percent or some other figure. *See Bailey v. Barnhart*, 473 F.Supp.2d 822, 838-39 (N.D.Ill. 2006) (cautioning against the danger of creating a "middle ground" RFC without expert support).

The ALJ is therefore instructed to re-state the reasons for Claimant's mental RFC. As part of that analysis, the ALJ should reconsider the following comment he made concerning the mental RFC:

> Indeed, the limitation to simple, routine, and repetitive tasks, which is based on the psychological impairments, may be unduly generous to claimant. The undersigned used that residual functional capacity in questioning the vocational expert. *But it is likely that claimant could also perform detailed tasks; that is, he could perform in tasks that require ordinary judgment, but not exacting judgment.*

(R. 142) (emphasis added). This comment essentially concedes that the ALJ had no solid medical ground on which to base the mental RFC and instead fashioned it for reasons that the Court is unable to discern. The ALJ had no expert opinion to rely on for assessing the mental RFC and never explained how he reached his decision. It is true, of course, that a doctor's report is not always necessary because the RFC constitutes a legal – not a medical – decision for the ALJ to make. *See Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) ("[T]he determination of a claimant's RFC is a matter for the ALJ alone – not a treating or examining doctor – to decide."). Without expert opinion, however, it was crucial for the ALJ to explain the basis of his reasoning clearly and to draw a logical bridge between the record and the RFC assessment. Even though the ALJ's assessment was more generous than the "likely" finding that Claimant could perform detailed tasks, an ALJ errs when he fails to explain how he arrived at the RFC assessment. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

## IV. Conclusion

For the reasons stated above, plaintiff's motion for summary judgment [22] is granted. The Commissioner's cross-motion [26] is denied, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order. On remand, the ALJ shall (1)

re-evaluate plaintiff's testimony concerning his symptoms, (2) reassess the RFC, and (3) reconsider the weights given to the expert reports of Dr. Ivankovich and Dr. Langgut.


_____
**Hon. Jeffrey Cummings**
**United States Magistrate Judge**

**Dated:  August 16, 2019**